Merrimack
No. 2007-794

IN THE MATTER OF THE LIQUIDATION OF THE HOME INSURANCE
COMPANY

Argued: April 30, 2008
Opinion Issued: July 25, 2008

*Orr & Reno, PA,* of Concord (*Ronald L. Snow* and *Lisa Snow Wade* on the brief) and *Morrison & Foerster LLP*, of New York, New York (*Gary S. Lee & a.* on the brief, and *Kathleen E. Schaaf* orally), for the appellant.

*Kelly A. Ayotte,* attorney general (*J. Christopher Marshall*, attorney, on the brief) and *Rackemann, Sawyer & Brewster PC*, of Boston, Massachusetts (*J. David Leslie* and *Eric A. Smith* on the brief, and *Mr. Leslie* orally), for the respondent.

HICKS, J. The appellant, Century Indemnity Company (CIC), appeals an order of the Superior Court (*Conboy*, J.) sustaining a referee's ruling denying CIC's asserted setoff of reinsurance claims in the liquidation of The Home Insurance Company (Home). The respondent is Roger A. Sevigny, Commissioner of Insurance of the State of New Hampshire, solely as Liquidator of The Home Insurance Company (the liquidator). We reverse and remand.

The following facts are supported by the record. Home is an insurance company organized under the laws of New Hampshire. It was declared insolvent and placed in liquidation by court order in June 2003. CIC is an

insurance company organized under the laws of Pennsylvania. CIC reinsures Home with respect to certain contracts between Home and other insurers. As claims pursuant to these contracts are allowed against Home in liquidation, CIC remits monies to Home pursuant to a claims protocol agreed upon by Home and the liquidator. The claims protocol provides that these payments to Home "shall be net of setoff in compliance with" RSA 402-C:34 (2006) or as otherwise allowed under New Hampshire law. RSA 402-C:34 provides, in pertinent part:

> I. SETOFFS ALLOWED IN GENERAL. Mutual debts or mutual credits between the insurer and another person in connection with any action or proceeding unde r this chapter shall be set off and the balance only shall be allowed or paid, except as provided in paragraph II.
>
> II. EXCEPTIONS: No setoff shall be allowed in favor of any person where:
>
> . . .
>
> (b) The obligation of the insurer to the person was purchased by or transferred to the person with a view to its being used as a setoff . . . .

RSA 402-C:34.

CIC also reinsures other insurance companies with which it is affiliated (CIC and such affiliated companies being all directly or indirectly one hundred percent owned by the same parent company) with respect to certain general liability policies issued by them (the Covered Policies) pursuant to an agreement titled "Pre-1987 General Liability Reinsurance Agreement" that took effect on December 31, 1995 (the 1995 agreement). "Reinsurance results when one insurer . . . 'cedes' (transfers) part of the risk it underwrites to another insurer . . . . " *In re Mission Ins. Co.*, 48 Cal. Rptr. 2d 209, 211 (Ct. App. 1995). Accordingly, we refer to the affiliated insurance companies reinsured by CIC as the "affiliated cedents."

Under the 1995 agreement, CIC agreed "to accept a one hundred percent (100%) quota share participation in the [affiliated cedents'] liabilities relating to Covered Policies" and to reimburse the affiliated cedents for all expenses relating to claims under the covered policies in exchange for, *inter alia*: (1) payment to CIC "of a sum equal to the net carried reserves . . . of the [affiliated cedents] for liabilities relating to Covered Policies"; and (2) assignment to CIC "of all rights to reinsurance recoverables (and any collateral pertaining thereto) relating to Covered Policies" held by the affiliated cedents. Among the reinsurance claims

assigned to CIC in the 1995 agreement are reinsurance obligations of Home to the affiliated cedents (the reinsurance recoverables). In other words, Home is a reinsurer of the affiliated cedents with respect to some of the Covered Policies and the affiliated cedents assigned their rights to recover that reinsurance to CIC in the 1995 agreement.

Pursuant to the claims protocol, CIC sought to setoff amounts payable by it to Home under the claims protocol against the reinsurance recoverables; that is, claims against Home as reinsurer of the affiliated cedents, assigned by the affiliated cedents to CIC in the 1995 agreement. The liquidator disagreed with the validity of the asserted setoff and the parties jointly requested that the referee deem the matter a disputed claim proceeding to be resolved in accordance with RSA chapter 402-C (2006 & Supp. 2007) and an established claims procedure order.

The matter proceeded before the referee, who denied setoff. The trial court sustained that decision, agreeing with the "implicit [conclusion] in the referee's Ruling . . . that under the circumstances of this case, the subject assignment does not establish the mutuality necessary to trigger the statute's setoff mandate." Specifically, the court concluded that because "[t]he terms of the assignment require the return of uncollectible reinsurance at face value to [the affiliated cedents,] . . . the assignment is not absolute."

On appeal, CIC argues that the court erred by ignoring the 1995 agreement's plain language, which unconditionally assigned the affiliated cedents' claims to it. To the extent this case presents issues of contract interpretation, we apply the following standard of review:

> The interpretation of a contract is a question of law, which we review *de novo*. When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract.

*Czumak v. N.H. Div. of Developmental Servs.*, 155 N.H. 368, 373 (2007) (citations omitted). As to the issues of statutory interpretation presented, our standard of review is as follows:

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. . . .

Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme.

*Cloutier v. City of Berlin*, 154 N.H. 13, 17 (2006) (citations omitted).

We start with the observation that, according to its plain language, RSA 402-C:34 allows the setoff of "[m]utual debts or mutual credits" unless certain exceptions apply. *Id.* Although the term mutual is not defined in the statute, it has a known meaning in our common law. We have noted that "[s]et-off is a statutory right . . . in the nature of a cross-action" and explained that "[d]ebts to be set off must be mutual, and to be mutual they must be due to and from the same persons in the same capacity." *Dole v. Chattabriga*, 82 N.H. 396, 397 (1926) (citations omitted). "Capacity," for these purposes, "means legal capacity (e.g., principal, agent, trustee, beneficiary)." *Matter of Midland Ins. Co.*, 590 N.E.2d 1186, 1192 (N.Y. 1992).

The referee and the trial court first noted that the obligations CIC sought to set off against its obligations to Home "run facially from Home to CIC affiliates, and not to CIC." Thus, absent more, setoff of the reinsurance recoverables against CIC's obligations to Home would be a prohibited triangular setoff: "[A] 'triangular setoff,' when A attempts to offset an obligation owed to B against B's debt to C, is prohibited because there is no mutuality of debt between two parties." *In re U.S. Aeroteam, Inc.*, 327 B.R. 852, 864 (Bankr. S.D. Ohio 2005).

CIC, however, asserts something more; namely, that the assignment of the reinsurance recoverables to it cures the lack of mutuality. The trial court concluded that the assignment did not establish mutuality, finding dispositive a put-back provision in the 1995 agreement that qualifies the assignment of the reinsurance recoverables as follows: *"provided, however, that [CIC] shall return to the respective [affiliated cedent] for face value, any such assigned reinsurance recoverables that are deemed by [CIC] to be uncollectible together with the rights to any related collateral."*

The trial court reasoned:

> The terms of the assignment require the return of uncollectible reinsurance at face value to [the affiliated cedents]. As the Liquidator notes, "[I]f the reinsurance is not collectible, then the amount of the reinsurance recoverable (its 'face value') is returned to the [affiliated cedent], which is then obligated to pay CIC that amount through the quarterly accounting and setoff mechanism provided in the [1995 agreement]." Thus, in this triangular situation, the assignment is not absolute and the real parties in

interest are [the affiliated cedents]. The bottom line is that CIC is asserting claims of its affiliates, and not its own claims. Under these circumstances, mutuality is lacking.

CIC contends that this conclusion "ignores the plain language of the [1995 agreement], which unconditionally assigned the claims of [the affiliated cedents] to CIC." The liquidator, on the other hand, contends that "the express language of [the put-back] proviso to the assignment . . . renders the assignment conditional, and not absolute." Specifically, the liquidator asserts that "[t]he plain meaning and intent of the proviso is to condition the assignment on the collectibility of the reinsurance," and that CIC is "an assignee for purposes of collection," acting not in its own capacity but as agent or trustee for the affiliated cedents. Accordingly, we examine the distinction between absolute assignments and assignments for collection.

■■ Under the first type of assignment, the "creditor/assignor . . . [transfers] his or her claim against a debtor in such a way as to effect a complete sale of the claim." *DeBenedictis v. Hagen*, 890 P.2d 529, 532 (Wash. Ct. App. 1995). Such "[a]n absolute assignment divests the assignor of all control and right to a cause of action against the original debtor; the assignee is entitled to control and to receive the benefits of the contract between the original debtor and the assignor." *Uni-Com Northwest, Ltd. v. Argus Pub. Co.*, 737 P.2d 304, 308 (Wash. Ct. App.), *review denied*, 108 Wash. 2d 1032 (Wash. 1987). Such an assignment "can create mutuality for setoff purposes," *U.S. Aeroteam*, 327 B.R. at 865, as follows:

> Under principles of contract law, when party A pays B's debt to C and obtains a valid assignment of C's rights against B, party A may now "step into the shoes" of C and assert all rights C had against B. By way of assignment, there are mutual debts now owing between parties A and B.

*U.S. Aeroteam*, 327 B.R. at 864-65 (citation omitted). This is precisely the theory under which CIC claims mutuality.

■ Under the second type of assignment, the "creditor/assignor [assigns] his or her claim against a debtor for purposes of collection." *DeBenedictis*, 890 P.2d at 532.

> Such an assignment transfers legal title to the claim, so the assignee can sue in his or her own name[,] . . . [but] leaves equitable ownership with the creditor/assignor. The resultant split in ownership gives rise to a fiduciary relationship between the assignor and assignee, and the relationship generally is one of principal-agent.

*Id.* (citations omitted). Thus, an assignee for purposes of collection "has been referred to as the trustee or agent of the assignor." *Harrison v. Adams*, 128 P.2d 9, 12 (Cal. 1942).

■ The significance of this type of assignment, for our purposes, is that it does not create mutuality between the assignee and the original debtor, and therefore does not permit setoff. Specifically, an assignee for purposes of collection cannot set off his personal debt against the assigned claim because, "[s]ince mutuality is essential, the debtor must be the beneficial owner of the claim or judgment which he seeks to set off and not merely a trustee on behalf of an assignor who has retained the equitable interest in the thing assigned." *Norman v. Berney*, 45 Cal. Rptr. 467, 474 (Dist. Ct. App. 1965); *see also Prudential v. Superior Court (Garamendi)*, 842 P.2d 48, 53 (Cal. 1992) ("[S]etoff can occur only between persons or entities of equal capacity; debts owed in a fiduciary, agency, trustee, or partnership capacity are not subject to setoff.").

■ To determine whether the assignment is absolute or conditional, we must ascertain the parties' intent. *Cf. Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 705 (E.D. Va. 2006).

> No particular phraseology is required to effect an assignment. The ultimate test is the intention of the assignor to give and the assignee to receive present ownership of the claim. A valid assignment may be made by any words or acts which fairly indicate an intention to make the assignee the owner of a claim.

*Premier Capital v. Skaltsis*, 155 N.H. 110, 115 (2007) (quotations and citations omitted). For an assignment to be absolute, "[t]he assignor must not retain any control over the fund or property assigned, any authority to collect, or any form of revocation." *Centex Constr.*, 448 F. Supp. 2d at 705 (quotation omitted) (applying Virginia law).

CIC contends that the "assignment is absolute because there is nothing in the [1995 agreement] that permits the [affiliated cedents] to withdraw it." It asserts that "[t]he assignment cannot be revoked and the [affiliated cedents] retain no rights in the reinsurance." Finally, it argues that "[b]ecause CIC never deemed the reinsurance uncollectible, the claims never reverted to the [affiliated cedents] and mutuality under RSA 402-C:34 was preserved." We agree.

We address CIC's final point first. CIC contends that the trial court erred in ruling that the return of uncollectible reinsurance recoverables to the affiliated cedents was required by the terms of the assignment. It argues that this ruling "ignores the contractual predicate for the return of the reinsurance claims—that CIC 'deem' them 'uncollectible.' " It further

asserts that "[t]he option to return the assigned claims to the [affiliated cedents] belongs solely to CIC and the transfer of the reinsurance claims to CIC is not affected unless CIC affirmatively declares that they cannot be collected."

The liquidator disputes the contention that the term "deem" gives CIC discretion whether to return uncollectible reinsurance recoverables. He contends that "the put back proviso is mandatory in providing that uncollectible reinsurance 'shall' be returned to [the affiliated cedents]." He further argues that "the plain meaning of 'deemed' does not mean 'affirmatively declared' but only 'think' or 'conclude' " and asserts that CIC has so concluded, based upon the statement of its president that "Home will pay nothing now that it is insolvent and CIC cannot recover any of those ceded liabilities where Home is the only reinsurer of those liabilities." The liquidator concludes that by operation of the mandatory put back provision, "the claims now belong to the affiliates, and not CIC."

We do not agree that the reinsurance recoverables "now belong" to the affiliated cedents. Whatever the meaning of the term "deem," we conclude that it requires some affirmative action on CIC's part that it has not at this point taken. As CIC argues, "[n]ot only has [it] not declared the reinsurance uncollectible, this appeal is itself part of CIC's continuing efforts to collect from Home's estate." Accordingly, to the extent that the liquidator may be arguing that the reinsurance recoverables have automatically reverted back to the affiliated cedents by the terms of the 1995 agreement, we reject that contention.

■ Returning now to the question whether the assignment was conditional or absolute, we conclude that it was absolute. The consideration for the 1995 agreement included "assignment of *all rights* to [the] reinsurance recoverables." (Emphasis added.) This language evinces an intent "to give . . . present ownership of" the reinsurance recoverables to CIC. *Premier Capital*, 155 N.H. at 115. Nevertheless, the liquidator contends that the assignment is qualified by the put back provision, which "makes the [affiliated cedents], and not CIC, liable for the amount of the reinsurance, leaving the beneficial interest in the provisionally assigned rights with the assignors."

We cannot agree that the put back provision leaves a "beneficial interest" with the affiliated cedents; rather, as argued elsewhere in the liquidator's brief, the provision "allocate[s] the credit risk on the reinsurance to the [affiliated cedents.]" We do not consider this risk, however, a retained interest or incident of ownership fatal to an absolute assignment. As CIC points out, the affiliated cedents do not control the implementation of the put back provision: "The option to return the assigned claims . . . belongs

solely to CIC. . . ." Thus, the put back provision does not constitute a prohibited means of control over the reinsurance recoverables or "any form of revocation" in the hands of the affiliated cedents. *Centex Constr.*, 448 F. Supp. 2d at 705 (quotation omitted).

Nor does the put back provision evince an intent to make CIC an assignee for purposes of collection on behalf of the affiliated cedents; indeed, the opposite is the case. To the extent the reinsurance recoverables are collectible, their proceeds, so far as appears, inure to CIC's benefit, offsetting its payment of liabilities under the covered policies. We see nothing in the 1995 agreement requiring CIC to remit or render an account of the proceeds of the reinsurance collectibles to the affiliated cedents or to hold such proceeds for their benefit. *Cf. Purco Fleet Services v. Dept. of Finance*, 90 P.3d 346, 351 (Idaho 2004) ("An assignee for collection holds any proceeds of the assigned claim in trust for the assignor."). To the extent the reinsurance recoverables are uncollectible, the affiliated cedents pay their face value to CIC, who in return transfers the reinsurance recoverables back to the affiliated cedents. As CIC explains: the put back provision simply "provides an alternate way for CIC to be reimbursed for its payments on the [affiliated cedents'] behalf. The liquidator implicitly recognizes this when it asserts that "CIC itself is *neutral*, in light of the proviso, because it will collect either from Home or from [the affiliated cedents]." Thus, rather than being an assignment for collection, the assignment is one for which collection is guaranteed by the assignor. Much like the First Circuit Court of Appeals, "[o]ur research reveals no case refusing to validate the use of a [claim] as a set-off simply because payment on the [claim] was guaranteed." *Depositors Trust Co., Etc. v. Frati Enterprises*, 590 F.2d 377, 380 (1st Cir. 1979). We have likewise found no case holding that a guaranteed collection assignment is not an absolute assignment; to the contrary, the case law suggests that the assignor in such assignments does not retain a beneficial interest in the thing assigned:

> The assignor may sue where he retains a beneficial interest in the chose in action assigned, as where the assignment is for security, or for collection, although it has been held that the fact that the assignor has guaranteed collection of an assigned claim will not permit him to sue thereon.

*Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571, 579 (5th Cir. 1981) (quotation and brackets omitted).

The liquidator nevertheless contends that because the put back provision "leaves the risk of uncollectibility with [the affiliated cedents], . . . it is their interests that are at stake in the claims." We cannot conclude, however, that because collection of the reinsurance recoverables would benefit the

affiliated cedents by reducing their liability, they have some claim or interest in the reinsurance recoverables sufficient to negate an absolute assignment. Such collection benefits the affiliated cedents merely collaterally or incidentally, much like payment by a principal debtor benefits a guarantor. Accordingly, we conclude that the assignment of the reinsurance recoverables pursuant to the 1995 agreement was absolute.

The liquidator nevertheless argues that we should affirm the trial court's order because the reinsurance recoverables were transferred to CIC with a view toward their use as a setoff and because setoff was within the referee's discretion. CIC contends that these arguments are not properly before us because they are not "fairly comprised" within the question presented in its notice of appeal and the liquidator did not file a cross-appeal. SUP. CT. R. 16(3)(b). Accordingly, CIC moves to strike these arguments from the liquidator's brief.

As the liquidator points out, however, the trial court made no rulings adverse to him which could be appealed. Rather, the court made two assumptions contrary to the liquidator's position. First, the trial court assumed, "without deciding, that the language of RSA 402-C:34 permits the Court no discretion in allowing setoff if all requirements set forth in the statute are met." The court also assumed that "the 1995 assignment of reinsurance recoverables was not made with a view to future setoff." Nevertheless, the court proceeded to decide the matter in the liquidator's favor. The liquidator also points out that we may sustain a trial court's decision, though made upon erroneous grounds, so long as there are valid alternative grounds to support it, *see Sherryland v. Snuffer*, 150 N.H. 262, 267 (2003), and urges us to do so here. For these reasons noted by the liquidator, we deny CIC's motion to strike and will address the liquidator's additional arguments.

The liquidator contends that setoff should be denied under RSA 402-C:34, II(b) because the reinsurance recoverables were transferred to CIC with a view to being used as a setoff. CIC counters that the transfer could not have been made with a view toward setoff because, pursuant to the 1995 agreement, the transfer "occurred in 1995, when Home's insolvency was years in the future." The liquidator nevertheless argues that the transfer did not occur until CIC chose not to return the reinsurance recoverables to the affiliated cedents:

> CIC's assertion of the claims reflects a decision *today* to have CIC, not [the affiliated cedents], assert the claims to enable CIC to make immediate use of them as asserted setoffs. In light of the proviso mandating return of uncollectible reinsurance at "face value" to [the affiliated cedents], this is a *present transfer* "with a view" toward setoff.

(Emphasis added.)

█ The liquidator notes that RSA 402-C:3, XVII (2006) broadly defines "[t]ransfer" to, in part, "include[] the sale and every other method, direct or indirect, of disposing of or of parting with property or with an interest therein or with possession thereof." The pertinent question, however, is when the transfer occurred. "[T]he 'transfer' for setoff purposes occurs when the right to payment is transferred or assigned." *U.S. Aeroteam*, 327 B.R. at 866. We conclude that the right to payment was transferred in 1995; indeed, CIC could not deem the reinsurance recoverables uncollectible unless it first had the right to attempt to collect on them.

Furthermore, as the liquidator at least implicitly acknowledges, his argument rests upon the premise that the 1995 transfer was conditional. He argues that "CIC's reliance on the date of the 1995 Reinsurance Agreement simply ignores the salient fact that the agreement did not unconditionally assign the [affiliated cedents'] reinsurance claims to CIC." Having previously concluded that the 1995 transfer was an absolute assignment that completely transferred the affiliated cedents' present ownership of the reinsurance recoverables to CIC, we logically must reject this argument also.

█ Finally, the liquidator argues that we should affirm on the grounds that the referee sustainably exercised her discretion in denying setoff. We agree with the trial court, however, "that the language of RSA 402-C:34 permits the Court no discretion in allowing setoff if all requirements set forth in the statute are met." RSA 402-C:34 provides that except as otherwise provided therein, mutual debts or credits "shall be set off."

> The intention of the Legislature as to the mandatory or directory nature of a particular statutory provision is determined primarily from the language thereof. Words and phrases which are generally regarded as making a provision mandatory include "shall" and "must." On the other hand, a provision couched in permissive terms is generally regarded as directory or discretionary. This is true of the word "may." It is the general rule that in statutes the word "may" is permissive only, and the word "shall" is mandatory.

*Appeal of Rowan*, 142 N.H. 67, 71 (1997) (quotation omitted). Thus, having used the word "shall," the legislature is presumed to have intended setoff under RSA 402-C:34 to be mandatory rather than discretionary.

The liquidator asserts, however, that RSA 402-C:34 was based upon Section 68 of the Bankruptcy Act, and argues that we should therefore look to cases construing that section. In turn, the liquidator contends that

although the language of Section 68 of the Bankruptcy Act appears to be mandatory, it has long been held to be permissive:

> The provision is permissive rather than mandatory, and does not enlarge the doctrine of set-off, and cannot be invoked in cases where the general principles of set-off would not justify it. The matter is placed within the control of the bankruptcy court, which exercises its discretion in these cases upon the general principles of equity.

*Cumberland Glass Co. v. DeWitt*, 237 U.S. 447, 455 (1915) (citations omitted).

We are not persuaded, however, to abandon settled rules of statutory construction that provide: "When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Cloutier*, 154 N.H. at 17. We have previously concluded that the word "shall" is "unambiguous. It is mandatory, not permissive, language." *Theresa S. v. Sup't of YDC*, 126 N.H. 53, 55 (1985). Had the legislature intended to vest the liquidator with the discretion to disallow setoffs, "it would have chosen more permissive language, such as 'may' or 'might.'" *State v. Doyle*, 156 N.H. 306, 309 (2007). Accordingly, we decline to read RSA 402-C:34 to authorize discretionary disallowance of otherwise qualifying setoffs.

For the foregoing reasons, we reverse the trial court's decision and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.