NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2d Circuit Court–Plymouth Family Division
No. 2020-0502

IN RE J.S.

Argued: June 17, 2021
Opinion Issued: July 30, 2021

Office of the Attorney General, (Weston R. Sager, attorney, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the juvenile.

HICKS, J. The juvenile, J.S., appeals a finding of delinquency made by the Circuit Court (Boyle, J.) based upon petitions alleging criminal mischief, simple assault, and attempted simple assault. We affirm.

The trial court could have found the following facts. On September 29, 2020, Chief Foss of the Campton Police Department filed seven delinquency petitions against the juvenile arising out of incidents alleged to have occurred at Mount Prospect Academy (Mount Prospect) on September 11, 17, and 29. Mount Prospect is part of the Becket Family of Services, where the juvenile was placed at the time of the alleged incidents.[1]

_____

[1] The exact relationship between Mount Prospect and Becket Family of Services is not clear from the record. We note that witnesses and counsel at the adjudicatory hearing appeared to refer to "Mount Prospect Academy," "Becket," and "Becket School" interchangeably, and the trial court appears to have considered these terms to refer to the same entity. In addition, the juvenile's brief

At the close of the State's case at the adjudicatory hearing, the court granted the juvenile's motion to dismiss one of the petitions for insufficiency of evidence, and denied his motions to dismiss the remaining petitions for lack of subject matter jurisdiction. The latter motions argued that the court lacked subject matter jurisdiction because the State failed to comply with RSA 169-B:6, III and IV, which provide:

> III. Absent serious threats to school safety, when a delinquency petition is filed by a school official, including a school resource officer assigned to a school district pursuant to a contract agreement with the local police department, or when a petition is filed by a local police department as a result of a report made by a school official or school resource officer, based upon acts committed on school grounds during the school day, information shall be included in the petition which shows that the legally liable school district has sought to resolve the expressed problem through available educational approaches, including the school discipline process, if appropriate, that the school has sought to engage the parents or guardian in solving the problem but they have been unwilling or unable to do so, that the minor has not responded to such approaches and continues to engage in delinquent behavior, and that court intervention is needed.

> IV. When a school official, including a school resource officer assigned to a school district pursuant to a contract agreement with the local police department, or a local police department as a result of a report made by a school official or school resource officer, files a petition involving a minor with a disability pursuant to RSA 186-C, upon submission of a juvenile petition, but prior to the child's initial appearance, the legally liable school district shall provide assurance that prior to its filing:
> (a) It was determined whether or not the child is a child with a disability according to RSA 186-C:2, I.
> (b) If the school district has determined that the child is a child with a disability, a manifestation review pursuant to 20 U.S.C. section 1415(k)(1)(E) occurred.
> (c) If the child's conduct was determined to be a manifestation of the child's disability, the school district followed the process set forth in 20 U.S.C. section 1415(k)(1)(F).
> (d) It has reviewed for appropriateness the minor's current individualized education program (IEP), behavior intervention

refers to "Mount Prospect Academy, also called the 'Becket School.'" We similarly assume that all references to "Becket" quoted in this opinion denote the same entity we have defined to be "Mount Prospect."

plan, and placement, and has made modifications where appropriate.

RSA 169-B:6, III, IV (2014). The juvenile argued that, according to Chief Foss's testimony, "these petitions were filed as a result of information provided by school officials." Specifically, Chief Foss testified that he had spoken to certain "members of the Becket staff . . . and other faculty."

The State countered that "Becket is not a 'school,' by definition," but, rather, constitutes a non-secure detention facility under RSA 169-B:2. See RSA 169-B:2, VII (2014) (defining "[n]on-secure detention" to mean "the care of a minor in a facility where physical restriction of movement or activity is provided solely through facility staff"). The court denied the motion, concluding that "Becket and Mount Prospect Academy are . . . not a school." The court explained: "It's nonsecure placement, and . . . the reason children are placed there and not going to a conventional school is because of behavioral issues."

The juvenile presented his case, eliciting further testimony from a Mount Prospect employee on the nature of its operations. The witness, Ian Detamore, stated that he was "employed with Mount Prospect Academy, Campton facility, which is the enhanced residential treatment . . . and shelter care facilities," as "executive director of the Campton campus." Detamore testified that Mount Prospect has a contract with the New Hampshire Department of Education and that the services Mount Prospect provides are subject to approval by the State Board of Education.

The court specifically inquired: "Is Mount Prospect Academy a school?" to which Detamore responded: "Mount Prospect Academy has an educational component with . . . in-home services, academic services, therapeutic residential milieu services. We do have a component that is absolutely a school, yes." The State then inquired:

> Q Would you say Mount Prospect Academy is solely a school?
> A No. Absolutely not.
> Q And would you compare it to -- would it be more comparable to a school or a nonsecure detention facility?
> A I would define it as a residential treatment setting for at-risk youth.

Detamore described the "enhanced residential treatment program" as a "contracted program[]" providing "a high level of services to youth as an alternative to community services or detention settings. So it is contracted to provide services to youth at risk of being detained or committed."

3

Following Detamore's testimony, the juvenile renewed his motion to dismiss on jurisdictional grounds, which the court again denied. The court dismissed four of the petitions on other grounds and entered findings of true on three petitions alleging criminal mischief, simple assault, and attempted simple assault, respectively. The court then made a finding of delinquency and ordered the juvenile committed to the John H. Sununu Youth Services Center for the remainder of his minority.

On appeal, the juvenile argues that the trial court "erred as a matter of law in determining that, on the undisputed facts in the record here, Mount Prospect Academy is not a school." Accordingly, he contends that the court erred by failing to dismiss the delinquency petitions.

Determining whether Mount Prospect is a "school" within the meaning of RSA 169-B:6, III and IV requires that we engage in statutory interpretation, "which presents a question of law subject to de novo review." Petition of N.H. Div. for Children, Youth & Families, 173 N.H. 781, 785 (2020).

> In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result. Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme. Absent an ambiguity, we need not look beyond the language of the statute to discern legislative intent.

N. New England Tel. Operations v. Town of Acworth, 173 N.H. 660, 667 (2020) (citations omitted).

Noting that RSA chapter 169-B does not define "school," the juvenile argues that Mount Prospect falls within various dictionary definitions of that term, as it is "an organized source of education and training of children, and . . . an institution or place for instruction or education." See, e.g., Webster's Third New International Dictionary 2031 (unabridged ed. 2002). The State, on the other hand, argues that RSA 169-B:6, III must be read in the context of the "overall statutory scheme[,] . . . [which] confirms that [Mount Prospect] is a

'facility' and not a 'school.'" The State specifically looks to RSA chapter 126-U, which defines the terms "facility" and "school":

In this chapter:

. . . .

III. "Facility" includes any of the following when used for the placement, custody, or treatment of children:

(a) The youth services center maintained by the department of health and human services, or any other setting established for the commitment or detention of children pursuant to RSA 169-B, RSA 169-C, or RSA 169-D.

. . . .

(c) Any foster home, group home, crisis home, or shelter care setting used for the placement of children at any stage of proceedings under RSA 169-B, RSA 169-C, or RSA 169-D or following disposition under those chapters.

. . . .

V. "School" means:

(a) A school operated by a school district.
(b) A chartered public school governed by RSA 194-B.
(c) A public academy as defined in RSA 194:23, II.
(d) A nonpublic school subject to the approval authority of the state board of education under RSA 186:11, XXIX.
(e) A private or public provider of any component of a child's individualized education program under RSA 186-C.

RSA 126-U:1, III, V (2021).

Our settled rules of statutory interpretation instruct that "[a]ll statutes dealing with the same subject matter are to be considered in interpreting any one of them" and, "[w]here reasonably possible, statutes should be construed as consistent with each other." In the Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88-89 (2014) (quotation omitted). Accordingly, "[w]hen interpreting two statutes which deal with a similar subject matter, we will construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute." Id. at 89 (quotation omitted).

The juvenile contends that "[b]ecause RSA [chapter] 126-U and RSA [chapter] 169-B are not in the same chapter or even in the same title, that canon of interpretation has less weight, if it applies at all." He further asserts: "RSA Chapter 126-U governs and limits the use of child restraint practices in schools and treatment facilities. RSA Chapter 169-B governs the proceedings in delinquency cases. There is, therefore, no reason to extrapolate definitional principles from one context to the other." We disagree. Both RSA chapter 126-U and RSA chapter 169-B address juveniles whose behavior warrants

5

intervention, whether it be restraint or delinquency proceedings.  In addition, RSA chapter 169-B is specifically referenced in RSA 126-U:1, III.  See 126-U:1, III (a), (c).  We conclude that the subject matter of both statutes is sufficiently similar that we may look to the provisions of RSA chapter 126-U in construing RSA 169-B:6, III and IV.

The juvenile, nevertheless, points out that RSA chapter 126-U defines the term "school" specifically for purposes of that chapter.  See RSA 126-U:1 (2021) (setting forth the meanings of terms "[i]n this chapter").  We do not, however, read wholesale into RSA chapter 169-B the definitions contained in RSA 126-U:1; rather, we consider RSA chapter 126-U and RSA chapter 169-B together in interpreting the latter statute, see In the Matter of Liquidation of Home Ins. Co., 166 N.H. at 88-89, which uses both the terms "school" and "facility" but defines neither.  See, e.g., RSA 169-B:6, III, IV (containing term "school"); :2, VII ("'Non-secure detention' means the care of a minor in a facility where physical restriction of movement or activity is provided solely through facility staff" (emphasis added)).

Considering both statutes together, we conclude that the legislature intended to distinguish between schools, on the one hand, and facilities for the placement of juveniles, on the other.  We note that all of the statutory references in RSA 126-U:1's definition of "facility" fall within the titles governing public health (Title X) and public safety and welfare (Title XII), while those in its definition of "school" fall within Title XV, governing education.  See RSA 126-U:1, III (referring to RSA 126-A:19, RSA 135-C:3, :7, RSA 171-A:2, :4 and RSA chapters 169-B, 169-C, 169-D, 170-E, 171-A, and 171-B), V (referring to RSA 186:11, XXIX, RSA chapter 186-C, RSA 194:23, II, and RSA chapter 194-B).  We conclude that the term "school" in RSA 169-B:6, III and IV denotes an institution whose primary purpose is the education of juveniles, and excludes any facility whose primary purpose is the placement of juveniles, even though the latter may provide educational services as an adjunct to its primary purpose of placement.  We therefore reject the juvenile's contention that "[i]nsofar as some 'placements' provide 'educational services' in lieu of a child's home school district, those placements function as a 'school.'"

We also reject the juvenile's contention that nothing in RSA chapter 169-B indicates that "the legislature contemplated a mutually exclusive, categorical distinction between a 'school' and a 'non-secure detention' facility" so as to preclude Mount Prospect from being a "school" for purposes of RSA 169-B:6, III and IV merely because it "also fits the description of a facility for 'non-secure detention'" in RSA 169-B:2, VII.  Considering RSA 169-B:6, III and IV together with RSA chapter 126-U, we conclude that an institution cannot be both a "school" and a "non-secure detention" facility under RSA chapter 169-B.  We note that RSA chapter 126-U does establish "a mutually exclusive, categorical distinction" between "schools" and "facilities."  It separately defines those terms

and uses both terms in the same provision.  See, e.g., RSA 126-U:2 (2021) ("[e]ach facility and school"), :4 (2021) ("[n]o school or facility").  Because we interpret statutes so as to "give effect to all words" therein, and we "presume that the legislature did not enact superfluous or redundant words," this usage demonstrates that the two terms cannot mean the same thing.  State v. Czekalski, 169 N.H. 732, 739 (2017) (quotations omitted) (noting that where the terms "chapter" and "paragraph," were both used in RSA 570-A:9, VII(a), "we must presume that the legislature intended [those] words . . . to have different meanings").  In addition, RSA chapter 126-U subjects schools and facilities to different rules.  See RSA 126-U:6 (2021) (limiting the types of restraint schools are permitted to use), :10 (2021) (providing different reporting requirements for facilities and schools when serious injury or death occurs to child subject to restraint or seclusion).  We conclude, therefore, that the terms are similarly mutually exclusive in RSA chapter 169-B, a statute "deal[ing] with a similar subject matter."  In the Matter of Liquidation of Home Ins. Co., 166 N.H. at 89 (quotation omitted).

The juvenile also argues that "there is nothing irreconcilable or contradictory in defining 'school' broadly for purposes of RSA Chapter 169-B so that some entities can be both a 'school' and a 'non-secure detention,' while treating 'schools' and 'facilities' as separate categories in RSA Chapter 126-U." Similarly, he asserts that "the requirements imposed by [RSA chapter 169-B] on a school and on school officials are not of such a nature as to make it absurd to apply them to Mount Prospect Academy."  However, even if those assertions were true, a statutory interpretation need not be irreconcilable, contradictory, or absurd to be rejected because it does not express the legislature's intent.  Indeed, choosing among alternatives that are neither irreconcilable, contradictory, nor absurd is a quintessential legislative function. Cf. Fein v. Permanente Medical Group, 695 P.2d 665, 683 (Cal. 1985) (noting, in context of rejecting claim that statute was unconstitutional because legislature could have attained its goal another way, that "[t]he choice between reasonable alternative methods for achieving a given objective is generally for the Legislature, and there are a number of reasons why the Legislature may have made the choice it did").

Finally, the juvenile argues that "[i]f there is any unifying principle underlying" RSA chapters 126-U and 169-B, it is child protection and narrowly interpreting the term "school" in RSA 169-B:6, III and IV so as to exclude Mount Prospect contravenes that intent "because it makes easier the attachment of the label 'delinquent' to a child, by relieving the State of the need to prove non-judicial efforts to resolve the behavioral issue."  We disagree. Even if RSA chapters 126-U and 169-B share a goal of protecting children, RSA chapter 169-B's purpose is broader and it is to be construed and administered "[c]onsistent[ly] with the protection of the public interest" and taking into account "the interests of public safety," 169-B:1, II, III (2014).  The legislature

reasonably could have concluded that the out-of-court interventions that the juvenile contends should have been provided and alleged in the petitions, such as efforts "to resolve the expressed problem through available educational approaches, including the school discipline process," RSA 169-B:6, III, would be superfluous when a juvenile's behavior had already warranted placement in a facility providing physical restriction of the juvenile's movement or activity. See RSA 169-B:2, VII.

For the foregoing reasons, we uphold the trial court's determination, on the facts presented in this case, that Mount Prospect is not a "school" for purposes of RSA 169-B:6, III and IV. Accordingly, we uphold the trial court's denial of the motions to dismiss and affirm the finding of delinquency.

Affirmed.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

8